United States District Court
District of Maine

Autumn Dinsmore,                          )
                                          )
                        Plaintiff         )
                                          )
            v.                            )    Docket No.
                                          )
State of Maine, Department of             )
Corrections; Joel Parsons; and            )
Dale Tobey,                               )
                        Defendants.   )


# Complaint
## Injunctive Relief Sought and Demand for Jury Trial

Plaintiff Autumn Dinsmore brings this civil rights action against the State of Maine, Department of Corrections (State or Department), Joel Parsons, and Dale Tobey to remedy the discriminatory working conditions at the Maine State Prison (Prison) and the Bolduc Correctional Facility (BCF) where she has worked as one of very few female correctional officers (COs).

## Summary of the Action

1.     Throughout her employment by the Department, Autumn has endured a work environment that is hostile and abusive to female COs. This severe and pervasive harassment stems from an institutional mindset—from

male COs to supervisors and administrators—that women COs should not work there.

2.      And the discriminatory atmosphere is rife with stereotypical and derogatory assumptions about female COs, including that they are inherently unfit because they will inevitably succumb to intimate relationships with male prisoners.

3.      The Maine Human Rights Commission investigated Autumn's discrimination complaint and, after an investigative conference and a separate hearing before the Commissioners, in January 2021 it issued a finding of reasonable grounds to believe that the State discriminated against Autumn on the basis of sex by subjecting her to disparate treatment and a hostile work environment. This official finding was based in part on the MHRC Investigator's Report.

4.      The MHRC Investigator's Report specifically concluded that "the discipline issued to Complainant, for infractions for which her male colleagues received no or lesser discipline, and the general atmosphere at the Prison . . . support Complainant's allegation that she was discriminated against based on her sex."

5.      The federal Equal Employment Opportunity Commission (EEOC) adopted the reasonable grounds findings of the MHRC after "reviewing the

information that is the basis of the" MHRC's "investigation and determination."

6.   The facts strongly support the findings of the MHRC and EEOC.

7.   Very soon after Autumn started working at the Prison, a male officer asked her whether she was "looking for love or a lawsuit." And her fellow COs told her that they did not think women should work there because women officers were always "getting in trouble."

8.   Less than one week after Autumn spoke out against her male coworkers' offensive and false stereotypes about the unfitness of all women COs, those same coworkers retaliated against Autumn by falsely reporting her for allegedly being "overly familiar" with a male prisoner.

9.   In fact, Autumn was just doing her job by talking with the prisoner about his college and career opportunities. She was punished with a two-day suspension based on her coworkers' false report, which was based on the sexist stereotype that a female officer conversing with a male prisoner must mean she was pursuing a romantic relationship.

10.   Autumn also received sexual overtures from male officers, including officers who sent her unsolicited and unwanted photos of their genitalia on Snapchat and who pressured her to send nude photos of herself to them. Autumn and other female officers overheard male officers making

inappropriate comments about having sex with female officers and talking about competing to see who could sleep with a new female officer first.

11.    This sexual harassment and the use of the sexist stereotype that women officers are sexual objects and will be unable to resist sexual desire for male prisoners was all the more unfounded and offensive in Autumn's case because Autumn is gay and is not romantically or sexually interested in men.

12.    Throughout her employment, Autumn was forced to endure abusive statements questioning the veracity of her stated sexual orientation. For example, when Autumn started working at the Prison, a male officer told her, "you're too pretty to be a lesbian," and one of her supervisors repeatedly questioned her sexual orientation, making comments like "you haven't found the right dick yet" or "you just haven't found a real man."

13.    More recently, a different supervisor repeatedly commented to her coworker that he should "take one for the team" and try to "flip" Autumn's sexual orientation by having sex with her.

14.    This refusal of her male coworkers and supervisors to accept Autumn's sexual orientation is consistent with the workplace culture of treating women COs as sexual objects and the traditional ideology that true lesbians are unlikely to exist because women cannot resist sexual attraction to men.

15.     The institutional mistrust of women COs and refusal of Autumn's male coworkers and supervisors to accept her sexual orientation led to Autumn being harshly disciplined when her similarly situated male counterparts were treated much more leniently for incidents of comparable or greater seriousness.

16.     For example, Autumn was given a two-day suspension for not having authorization when allowing a prisoner into the area ("pod") she was supervising. But the male COs who let the prisoner into her pod in the first place were not disciplined at all, even though one of them admitted that his comparable actions were similarly unauthorized. And Autumn was harshly disciplined even though the investigator found that the rule was sometimes violated by COs and that supervisors were not concerned with enforcing it.

17.     Autumn was also reassigned to a position with less overtime and suspended for two weeks without pay based on the pretext of having "non-work-related contact with a probationer." This contact occurred because Autumn reasonably believed the probationer was stalking her, including by following her in public, asking her ex-girlfriend about her, and calling her at work.

18.     After the Prison ignored her requests for help with this dangerous situation, Autumn asked a male friend to call the probationer to try to get him to stop. Only when the harassing probationer specifically asked

5

to speak with her as a condition of backing off did she call him to request that he leave her alone. Even though she again asked the Prison for help, she was disciplined for contacting the probationer and told there was nothing they could do to protect her.

19.     This two-week suspension without pay for a single phone call to a former prisoner cannot be reconciled with the Prison's failure to impose any discipline on a male CO who admitted to the Prison that he had an in-person conversation with the same probationer and who further reported to the Prison that many COs run into and "chat" with probationers at a bar in Rockland. None of those COs were disciplined.

20.     Supervisors, including the Director, openly chat in front of the facility with former prisoners who they have invited to visit them. For example, one former prisoner would regularly walk his dog to the prison and stop in with the dog to visit with some of the sergeants and COs. And another former prisoner would call Autumn's sergeant and other COs on the phone at work to chat with them.

21.     Upon information and belief, although the Prison was aware of these frequent communications and interactions with former prisoners, none of the Prison staff involved were disciplined for that behavior, which continues to this day.

22.     In April 2019, Autumn filed a Complaint with the Maine Human Rights Commission (MHRC) alleging discrimination based on her sex, sexual orientation, and disability, and retaliation. But despite the Department being on formal notice that Autumn was confronting a discriminatory hostile work environment, the harassment has continued unabated.

23.     For example, Officer York used Autumn as an example while explaining to a new officer that female officers have a "bad reputation" at the Prison, falsely stating that Autumn had a romantic relationship with a prisoner. And her supervisor repeatedly used the homophobic slur "fag" in front of her and called her a "typical female."

24.     Given the anti-woman culture at the Prison, it comes as no surprise that Autumn was not the only female CO to be told that she was not welcome because of her sex. Other female COs at the Prison and BCF have been told by male coworkers that they do not believe women should work there.

25.     When one female CO called a supervisor to ask about a transfer opportunity, she was told she would not get the job because "women are more trouble than they're worth down here."

26.     And another female CO was told as part of her official training at the Maine Criminal Justice Academy that it was "just statistics" that "5 out of 6" female COs would end up in a relationship with an inmate.

7

27.     These other female COs also endured sexual comments and harassment from their male coworkers, including one female officer whose male coworker assaulted her by slapping and grabbing her butt.

28.     These discriminatory and abusive working conditions took a foreseeable toll on Autumn's health and well-being. But when she requested medical leave, Human Resources took seven months to provide the correct paperwork. And, in the meantime, it denied Autumn's requests for leave to attend medical appointments and for accommodations related to symptoms of her anxiety disorder.

29.     As a result of this intentional discrimination and retaliation, Autumn is seeking all available remedies, including back pay and benefits, compensatory and nominal damages, declaratory and injunctive relief, and attorney's fees and expenses.

## Parties

30.     Plaintiff, Autumn Dinsmore, is a resident of Rockland, Knox County, Maine and an employee of the Department.

31.     Defendant State of Maine Department of Corrections is a department of the Maine state government, which operates the Maine State Prison and Bolduc Correctional Facility in Warren, Knox County, Maine, as well as other correctional facilities in Maine.

32.     Defendant Joel B. Parsons is a Correctional Captain at Maine State Prison and an employee of the Department. He is sued in his personal and individual capacity solely for damages, and in his official capacity as a state actor for declaratory and injunctive relief only.

33.     Defendant Dale R. Tobey was formerly a Correctional Sergeant at Bolduc Correctional Facility and an employee of the Department. He is sued solely in his personal and individual capacity for damages and is not being sued in his official capacity.

## Jury Trial Demand

34.     Under Fed. R. Civ. P. 38(b), Plaintiff demands trial by jury on all issues triable by a jury.

## Jurisdiction and Venue

35.     This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, 42 U.S.C. § 1983, the Maine Family Medical Leave Requirements Act, 26 M.R.S. §§ 843-848, the Maine Human Rights Act, 5 M.R.S. §§ 4551-4634, and the Maine Whistleblowers' Protection Act, 26 M.R.S. § 833. This Court has proper subject matter jurisdiction over Autumn's federal claims under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), and

supplemental jurisdiction over Autumn's state law claims under 28 U.S.C.
§ 1367.

36.     The State of Maine has consented in writing to suit in federal
court on Autumn's claims under the Maine Human Rights Act and the Maine
Whistleblowers' Protection Act.

37.     Venue is proper in the District of Maine under 28 U.S.C.
§ 1391(e)(2) because (1) Plaintiff resides in Knox County, Maine; (2)
Defendant operates in Maine; and, (3) under 42 U.S.C. § 2000e-5(f)(3), the
unlawful employment practices that are the basis of the Complaint are
alleged to have occurred entirely in Maine. Under Rule 3(b) of the Rules of
this Court, this action is properly filed in Portland because Knox County is
"the county in which a substantial part of the events or omissions giving rise
to the claim occurred."

## Facts

38.     Autumn has worked as a Correctional Officer (CO) for the
Department since January 23, 2017.

39.     Autumn is currently a CO at Bolduc Correctional Facility (BCF)
in Warren, Maine, and she worked as a CO at Maine State Prison in Warren,
Maine from January 23, 2017 to September 23, 2019.

40.     Autumn is one of about four female COs who work at BCF. About four or five female correctional officers work at the Prison.

41.     Autumn is a lesbian, and she is one of only two openly gay women COs at either Bolduc or the Prison.

### Autumn Has a Strong Start in Her Chosen Career as a CO

42.     Ever since Autumn was a small child, it has been her goal to work in law enforcement. Over time, she realized that, more than anything else, she wanted to work in corrections. In choosing this career path, her role model was her grandmother, who was a Sergeant at the Knox County Jail in Rockland for 25 years.

43.     Before Autumn graduated from Medomak Valley High School in 2013, she completed a Basic Emergency Medical Technician course and Firefighting I & II courses at the Mid-Coast School of Technology in Rockland. Following her high school graduation, she completed courses in Criminal Justice as part of a year of study at Central Maine Community College in Auburn.

44.     Autumn is currently pursuing her Bachelor's Degree in Criminal Justice with a concentration in Homeland Security and Counterterrorism at Southern New Hampshire University. She has excelled in her courses and has a 4.0 GPA.

45.    Autumn had successful tenures in her first two corrections jobs at Two Bridges Regional Jail in Wiscasset (April 2014 to May 2015) and Knox County Jail in Rockland (August 2015 to mid-January 2017). During Autumn's early employment in corrections, she became certified in the field through the Maine Criminal Justice Academy.

46.    Autumn's career goal was to work for the Prison because it is the largest correctional facility in Maine and offered the most opportunities for career advancement. She was thrilled to be hired as a CO at the Prison in late January 2017 and loved her job there from the very start.

## Autumn Is Singled Out for Harassment and Discipline Due to Sex-Based Stereotypes.

47.    Autumn soon found, though, that she was targeted for harassment by coworkers and supervisors based on her sex and sexual orientation.

48.    As early as February 2017, Autumn repeatedly heard her male coworkers make statements to the effect that women should not work in the Prison. One officer asked Autumn whether she was there "for love or a lawsuit."

49.    Soon after she started, Autumn received unwelcome advances from male officers in person and on social media. When she told one officer

that she was not interested because she was gay and was in a relationship, he told her, "you're too pretty to be a lesbian."

50.     Another officer sent her messages on Snapchat pressuring her to send him nude photos because he was "lonely." She declined and deleted him from her social media accounts.

51.     And Autumn received unwanted sexual photos from another male officer on Snapchat, including photos of his penis.

52.     It was well known at the Prison that some of the male officers had a competition to see who could sleep with new female officers, as they would openly joke and talk about the competition in front of supervisors and other officers.

53.     In August 2017, a prisoner approached Autumn and told her he had "heard some stuff" about her from another CO. Taken aback, she asked the prisoner what he had heard. The prisoner replied that CO Peter Small had told him that she was a "dyke."

54.     When she asked how that conversation came about, the prisoner told her that Small was talking about "getting with" female officers and said that "he couldn't get with [Autumn] because she is a lesbian." According to the prisoner, he questioned that statement, and Small responded, "yeah, she's a dyke."

13

55.     Later that day, the same prisoner said he was sorry to hear that Autumn's dog had been run over. Autumn asked how he knew that, and the prisoner said that Small told him that her dog got hit by a car.

56.     Because Autumn had not shared the information about her dog dying with Small or anyone else at work, she deduced that he had learned the information because he was "friends" with her on Facebook.

57.     Autumn's Facebook page is set so that only her Facebook "friends," like Small, can see her relationship status and her photos. She chose that setting in part to protect her personal information from prisoners or former prisoners.

58.     Autumn later learned from the prisoner that Small had shown him personal photos from her Facebook page, including a photo of her and her girlfriend and a photo of her dog, using the Prison's computer.

59.     Autumn reported Small's misconduct to her Unit Manager, and an investigation was commenced against him. The investigator was Captain Joel Parsons.

60.     According to Captain Parsons's report, Small admitted that the prisoner would stop at his workstation when he worked the prisoner's pod and would have conversations with him "that would last fifteen (15) minutes or so and that most frequently Prisoner [redacted] would discuss what he intends to do when he is released from prison."

14

61.     Small stated that, during one of those conversations, the prisoner had said that he was going to "get with" Autumn. According to Small, he did not tell the prisoner that his comment was inappropriate, and he instead responded that the prisoner could not "get with" Autumn and suggested that it was because Autumn is gay.

62.     The prisoner remembered the conversation differently, stating to Captain Parsons, as he had to Autumn, that Small was the one joking about "getting with" different female COs, and that Small had complained that he could not "get with" Autumn because she was "a dyke."

63.     When Autumn was interviewed as part of the investigation, Captain Parsons pressed her about whether information about her sexuality was "common knowledge" among her coworkers, suggesting that it was somehow her fault, rather than Small's fault, that he and the prisoner were discussing having sex with her and her sexual orientation.

64.     Ultimately, however, Captain Parsons concluded that the prisoner's testimony was credible and that Small, not the prisoner, was the one talking about "getting with" female COs and who shared personal information about Autumn's sexual orientation.

65.     Captain Parsons did not make any finding as to whether Small had shown the prisoner Autumn's Facebook page on the Prison's computer, even though Autumn reported that he had done so. Previously, Autumn was

disciplined for accessing her college website on the Prison's computer to check her schedule.

66.    During her interview with Captain Parsons, Autumn also reported that, around November 2017, the same prisoner approached her and told her that Small had referred to Autumn as the prisoner's "girlfriend," and that Small had told him that they could no longer talk because the prisoner and his "girlfriend" had "gotten him in trouble."

67.    A few days later, the prisoner informed Autumn that every time Small would pass the prisoner, he would ask him how his "girlfriend" Autumn was doing. No action was taken in response to Autumn's reports of this inappropriate harassment of her because of her sex.

68.    The prisoner confirmed a similar interaction, stating that, on one occasion, Small had denied him a meal tray and, when he asked why, Small said, "you and your girlfriend know."

69.    As a result of the investigation into Autumn's report, Small received a "written reprimand" for sharing "personal information about a coworker with a prisoner," in violation of the Department's Code of Conduct, Procedure "C," item #23, which provides:

> Employees shall not become overly familiar with or have a non-professional relationship with any person in custody or under supervision in the community beyond the normal course of fulfilling their duties. Employees shall avoid any appearance of impropriety with any person in custody or under supervision in

the community. Employees shall not share with any person in custody or under supervision in the community any detailed personal information about themselves or about any other person, whether directly or by negligent conduct.

Examples of prohibited conduct, whether direct or indirect, include but are not limited to; giving or receiving non-work related letters, messages, money, personal mementos, pictures, telephone numbers; non-work related contact or visits with a family member of any person in custody or under supervision in the community; conversation of a romantic or sexual nature; or financial involvement with any person in custody or under supervision in the community.

70. Despite being in the Code of Conduct, the phrase "overly familiar" was not used during the investigation to describe Small's conduct in disclosing personally sensitive details about Autumn's personal life with a prisoner, nor did the results of the investigation refer to Small's use of the Prison's computer, his completely inappropriate comments about "getting with" Autumn, or his repeated inappropriate jokes about Autumn being in a relationship with a prisoner.

71. In March 2018, Autumn started working the night shift with COs Joseph Dighton, Eric McVay, and Andrew Stanley. She was the only female CO assigned to the night shift.

72. On one of the first night shifts that Autumn worked, Dighton said to her that female officers should not be allowed to work in the Prison and, if it were up to him, he would not allow it. He also made sex-based jokes about a female Correctional Care and Treatment Worker (CCTW) sleeping

17

with a prisoner and discussed how female COs had "a reputation for getting into trouble." The other officers agreed with Officer Dighton and laughed at his comments.

73.    Autumn objected to their characterization of female COs at the Prison and defended the CCTW, saying that they were spreading unsubstantiated rumors about her. They persisted in arguing that female correctional officers could not be trusted around male prisoners, and eventually Autumn went to a separate area to work so she did not have to endure their sexist and degrading comments.

74.    Less than a week later, Dighton, McVay, and Stanley retaliated against Autumn by reporting her for being "overly familiar" with a prisoner, alleging that she was talking to the prisoner for a long time, and that she shared "personal information" about herself and coworkers. The example of personal information they gave was that she told the prisoner that she and her coworkers went to a bar in Rockland and that she talked about their "future plans."

75.    Autumn's conversation with the prisoner primarily concerned his goals after being released from the Prison, available career and college opportunities, her own experience taking college classes, and the experiences of her family and friends with relevant career and educational opportunities.

76.    Part of Autumn's correctional officer job is to encourage rehabilitation by connecting prisoners with educational and vocational opportunities offered by the Prison. The Mission Statement of the Maine State Prison states in part that "We . . . promote rehabilitation by providing work opportunities and a comprehensive treatment plan that encourages the offender to re-enter society as a law-abiding, productive citizen."

77.    Although Autumn mentioned some information about herself in the course of the conversation and responded to some questions from the prisoner about other officers, her conversation was similar to conversations she had heard other officers having with prisoners. She did not share any detailed personal information about herself or any other officer during the conversation, nor was the conversation "of a romantic or sexual nature."

78.    During the investigation, which was again conducted by Captain Parsons, Stanley stated that he had observed Autumn chatting with the prisoner, so he reported it to his supervisor, Sergeant Steve Smith, who then instructed him to listen to their conversation to "make sure nothing inappropriate was being said."

79.    In Autumn's experience, such an instruction by a supervisor to a CO to spy on another CO is very unusual, and she is not aware of any other Sergeant directing a CO to secretly listen to a male CO's conversations with an inmate to try to catch them saying something inappropriate.

19

80.     What was even more unusual is that Stanley then invited Dighton and McVay to listen to the conversation with him for an extended period of time, rather than doing their usual tasks. At the MHRC Conference, Captain Parsons admitted that this was not normal and that, if they were there for that long, they "should have found something else to do."

81.     When Autumn was interviewed for the investigation by Captain Parsons, she reported the comments that Dighton had made about the CCTW sleeping with a prisoner and "that female staff at MSP have a reputation for getting into trouble." She also described how "Officer Stanley and Officer McVay would nod their heads and laugh" at his comments.

82.     Another officer interviewed for the investigation confirmed that "he has heard Officer Dighton, on multiple occasions, make comments to the effect that he does not believe that women should work in a male prison."

83.     At the time, no one investigated these comments by Dighton. Months later, soon after Autumn's lawyer put the Department on notice that she was considering litigation, Officer Dighton received a belated written reprimand.

84.     Autumn also reported to Captain Parsons during the investigation that Stanley, who was in charge of scheduling and assignments on their shift, repeatedly assigned her to Medium C-Pod even though "everyone knew" she had been so severely sexually harassed by prisoners in

20

that pod that her day shift sergeant had pulled her out of that pod for her safety.

85.    No one followed up with her about these reports, and Stanley continued to assign her to Medium C-Pod.

86.    As a result of the investigation, Autumn was given a two-day suspension for being "overly familiar" with the prisoner, even though the information she shared with the prisoner was less detailed and less personal than the information about her that Small received only a written reprimand for disclosing.

87.    On the discipline form, Autumn checked the box that she "disagreed" with the conclusions of the investigation.

88.    In May 2018, Autumn's unit manager reported her for allowing a prisoner from a different pod into the pod where she was assigned, allegedly so that he could "visit with her." The unit manager's report was based on a report by Sergeant Scott Harvey, who alleged that an officer had reported seeing a prisoner enter Autumn's pod and stand at the desk talking with her.

89.    Although officers speaking with prisoners is not unusual, Sergeant Harvey took the extraordinary step of reviewing all the video footage of the pod and counting exactly how many times the prisoner entered the pod and for exactly how many minutes he spoke with Autumn (less than 15 minutes each time).

21

90.     Based on that report, Autumn was again investigated for violating the "overly familiar" policy, as well as an additional directive (a "Post Order") ordering "staff" to prevent prisoners from entering a pod to which they are not assigned "unless under direct supervision by authorized staff." The investigation was conducted by Captain Parsons.

91.     During the investigation, Autumn explained that she believed that prisoners in the Medium Unit were allowed to visit other pods, and that she thought that COs were "authorized staff" who could supervise prisoners from another pod as provided in the Post Order. She also stated that, in her experience, prisoners "are frequently allowed by Correctional Officers into pods they are not assigned to." She admitted to allowing the prisoner into her pod and explained he had told her he needed to see another prisoner to give him exercise straps for yoga.

92.      Importantly, Autumn explained that she did not call for the prisoner to come to her pod, but rather that Officer York had called her and advised her that he was sending the prisoner to her pod to give exercise straps to another prisoner.

93.     According to the report of the investigation, Officer York admitted that he knew that the prisoner was not allowed to be let into Autumn's pod without authorization from the Unit Manager, but that he

nonetheless twice called Autumn to request that she allow the prisoner into her pod.

94.   Officer York was never investigated or disciplined for allowing the prisoner into Autumn's pod.

95.   The male Zone Control officer, who is responsible for controlling the pod doors to let prisoners in and out was also never investigated or disciplined for allowing the prisoner into Autumn's pod.

96.   The investigation report concluded that "[i]t is understood that staff, at times, violate [the Post Order]" and that "[t]his staff behavior is not something that supervisors at MSP spend their time actively looking for."

97.   Captain Parsons nonetheless sustained the allegations against Autumn for letting the prisoner into her pod, and she received another two-day suspension. Captain Parsons appears to have concluded that Autumn did not violate the "overly familiar" policy, but he chose not to make that finding explicit in his report.

### The Department Denies Autumn Assistance with Stalking by a Probationer and Disciplines Her Instead

98.   In mid-June 2018, and before June 25, 2018, Autumn contacted several Department employees to report her concern that she was being stalked by a former prisoner and to seek help.

99.    On June 20, 2018, she told CO Darrin Fillebrown that she believed that a former prisoner was stalking her, in part based on Fillebrown's statement to another officer that the former prisoner had asked him how to contact her. She told Fillebrown that she would likely need him to write a report about his interaction with the former prisoner to accompany the written report Autumn was preparing about the stalking behavior. He agreed to do so.

100.    Autumn also reported orally to Sergeant Harvey, Captain Scott Drake, and Lieutenant Lidia Burnham that she was having trouble with ongoing harassment and stalking from a former prisoner and asked for their help dealing with the situation.

101.    The harassing behavior that Autumn endured and reported included: (1) she had seen the former prisoner in public three times within the span of under three weeks, and she reasonably suspected he was purposely following her or going to places she might be; (2) on two of those occasions he came up to her and spoke to her, including saying something about stalking her, telling her to call him, and yelling his phone number to her; (3) after he made the comment about stalking her, her car was followed closely by another car with its high beams on that she believed to be the car his wife was driving; (4) he had gone to a bar she sometimes goes to with other COs and had asked the COs there about her whereabouts; (5) he knew

24

who her ex-girlfriend was and approached her ex-girlfriend at a bar to ask about her and their relationship; (6) she saw an unknown SUV similar to his SUV parked at the end of her driveway and driving by her house multiple times; and (7) he called her twice at work.

102.   Around June 2, after Autumn had already run into the former prisoner in public three times in less than two weeks, including one time when he commented to her about stalking and told her he was going to leave his "crazy wife," she arrived home to see a dark SUV parked at the end of her driveway. From her car, Autumn saw the passenger door of the SUV briefly open, but when she got out of her car to walk toward her apartment, which would have taken her past the SUV, the SUV's door quickly closed and it drove away. She saw the same SUV drive by her apartment several more times.

103.   Concerned that it was the former prisoner, who had previously said his wife owned a black SUV, Autumn called a friend in the Rockland Police Department Dispatch to see if they could ask a Rockland Police Officer to drive by her house a few times to make sure she was safe. A police officer did come and drive down her street, and she did not see the SUV again.

104.   At around the same time, Autumn began receiving a lot of calls from unknown numbers. After the incident with the SUV, she was concerned that the former prisoner was also trying to contact her by phone.

25

105.   After receiving these calls, on June 3, Autumn accessed the former prisoner's information in the Prison's computer system (CORIS) to confirm whether it was he who had repeatedly called her and whether it was his vehicle that she saw at her house. She also looked to see if there were any warnings in the system about him because another CO had told her he had previously stalked a female CO.

106.   It turned out that the calls to her phone were not from any number associated with the former prisoner, and there were no alerts or warnings about him in the system.

107.   On June 8, the former prisoner called Autumn's work number and hung up without identifying himself. On June 12, he called her at work and left her a message asking her to call him, this time identifying himself only as "David." When Autumn listened to the message, she thought it was her stepbrother, "Devin," because she could not think of anyone she knew named "David." It was only after she asked why her stepbrother had called that she realized that it was the former prisoner who had left the message.

108.   That evening, shaken by the former prisoner's repeated attempts to contact her, she asked her male friend to try calling the former prisoner, hoping that speaking with a man would cause him to leave her alone. But the former prisoner told her friend that he would only stop if Autumn herself

26

asked him to do so, so Autumn called back to tell him she wanted him to leave her alone.

109.   In all, Autumn and her friend each spoke to the former prisoner once for only a few minutes.

110.   In addition to contacting the former prisoner directly to ask him to leave her alone, Autumn also contacted the police, obtained a temporary protection from harassment order against him, and started carrying a concealed weapon.

111.   On June 25, 2018, Autumn was served with a notice of investigation based on an allegation that she "had non-work related contact with a probationer." The former prisoner's wife reported to the Prison that Autumn had called her husband "repeatedly," which was false.

112.   Once again, Autumn was accused of violating the "overly familiar" policy, as well as policies prohibiting "personal" contacts with recently incarcerated individuals.

113.   The investigation was later amended to add the allegation that Autumn used CORIS, the Prison's computer system, to access "confidential" information about the former prisoner.

114.   After receiving the notice of investigation, Autumn immediately reported again in a detailed written report the stalking and harassment she

had experienced, but no action was taken by the Prison to help protect her from the unlawful stalking behavior by the probationer.

115.   Autumn was told that, because there was no policy prohibiting former prisoners from contacting officers outside the facility, there was nothing they could do to stop it, despite the former prisoner still being in the Department's custody as a probationer.

116.   At the same time the Department commenced the investigation, it reassigned Autumn to a different and lower-paying CO position. The Department stated that this reassignment was being made "in order to protect the population we serve."

117.   The new position was primarily stationed in the building where members of the Prison's administrative staff work, separate from the building where prisoners are housed and most COs work.

118.   Autumn was assigned primarily to oversee visits from members of the public with prisoners, and she was not allowed to bid on overtime work outside the prisoner visiting area, resulting in significantly less pay each week.

119.   Prison management justified Autumn's reassignment based on the pretext of protecting prisoners, despite the allegations against her being unrelated to her actions towards prisoners.

28

120.   In her new, lower-paying position, Autumn had more direct contact with prisoners than she did previously. She remained in contact with prisoners during visitation hours, and on a daily basis she was asked to oversee prisoners in the chow hall and as they went to and from the chow hall.

121.   Autumn retained access to CORIS in her new job, but, because of the investigation into her efforts to protect herself from a probationer who was stalking her, she was denied access to the computer to do necessary administrative tasks, making her job harder.

122.   Autumn's supervisor in this new job made frequent sexual comments to her that were disparaging of her sexuality. He would ask her about being gay, and would make comments to her like "you haven't found the right dick yet," or "you just haven't found a real man." He would press her for her "price" to sleep with a man, insisting that she must be willing to sleep with a man if he paid her enough money.

123.   This supervisor repeatedly told Autumn that if she reported his comments, he had "the best attorneys" and nothing would happen to him. Autumn knew that he was well-liked by other officers and supervisors, and she was afraid that if she reported his comments, especially while she was under investigation, he would ruin her career as a correctional officer. Other

29

officers Autumn worked with knew that Autumn was uncomfortable around the supervisor and helped shield her from working alone with him.

124.   Autumn was reassigned to the lower-paying job for about ten months. In Autumn's experience, that is much longer than a disciplinary investigation concerning a CO usually takes.

125.   Upon information and belief, no male CO has been reassigned to a new position while an investigation was pending.

126.   After an investigation, Captain Parsons sustained the allegations against Autumn, finding that, although she and the former prisoner both stated that the purpose of her contact with him was to get him to stop contacting her, she had still violated the policy by contacting him and by using CORIS to access his information. Captain Parsons found it "credible" that the former prisoner was "joking" about stalking Autumn, and that they ran into each other three times in less than three weeks by coincidence.

127.   Autumn was suspended for two weeks without pay. When Autumn was suspended, she was escorted out of work in front of all of the residents and officers. That type of open display of discipline of a CO is usually avoided because it discredits the CO in front of the prisoners and can have a damaging effect on their authority, credibility, and reputation when they return to the pod. In fact, it is dangerous for COs when prisoners believe they lack the support of their coworkers and superiors.

30

128.   In contrast to how Autumn was treated, a male CO was recently arrested at work for a domestic violence offense, and he was not walked out of his pod but was called to leave the pod and then was arrested outside the facility, away from the prisoners.

129.   Later, after Autumn transferred to BCF, the same former prisoner came into the facility without authorization, stood out of sight near the office where Autumn was working, and watched her as she worked. It was only after this incident that the Department helped Autumn obtain a modification of the former prisoner's conditions of release so that he was prohibited from having contact with her.

130.   Autumn's reassignment and suspension sent the message to her peers that she could not be trusted to do her job, and it damaged her reputation. It fed into the stereotypes about female officers "getting into trouble," and gave ammunition to the male officers who believed women should not work there.

131.   Male officers began to spread disparaging rumors about Autumn. For example, Officer Travis York falsely told a new female CO that Autumn had developed a relationship with a prisoner, and he suggested that the new CO stay away from Autumn because she was a CO with a "bad reputation."

31

### Autumn Continues to Report Ongoing Discriminatory Harassment to the Department.

132.   In January 2019, Autumn reported to Jeanne Fales in Human Resources and Deputy Warden Troy Ross that she was continuing to hear hostile comments about women working at the Prison. She told them that it was "the same" officers she was hearing this from again and again and that it was an "ongoing thing."

133.   Ms. Fales's response to her report about these comments was to suggest that Autumn "call" the officers "out." When Autumn told her she thought she would be further ostracized by other officers or retaliated against if she did so, Ms. Fales told her it was her "responsibility" to report them by name each time they said something or else nothing could be done.

### The Department Denies Autumn's Request for Medical Leave.

134.   The harassment and discrimination by Autumn's peers and managers at the Prison tormented her, made it difficult for her to do her job, made her workplace feel toxic and hostile, caused her severe offense and stress, and adversely affected her health.

135.   Starting in about early 2018 and continuing through the present, due to the harassment and discrimination, including the repeated and unwarranted personnel investigations and discipline, she has developed severe anxiety that causes insomnia and leaves her feeling worn out and very

fatigued. These adverse health effects sometimes made it difficult for Autumn to work her scheduled shifts or arrive at work on time.

136.   On August 2, 2018, Autumn notified Jeanne Fales that she was experiencing severe depression and anxiety as a result of having been reassigned while under investigation. At that time, she asked whether she could take leave to address the symptoms she was experiencing.

137.   Autumn informed Ms. Fales that sick days she had taken recently were related to those symptoms. Ms. Fales asked Autumn to fill out workers' compensation paperwork reporting an injury of "stress/mental health," but did not address her request for medical leave.

138.   On August 4, 2018, Autumn's symptoms were particularly bad, and she was feeling especially fatigued and anxious, so she called in sick to work. She was disciplined for taking that day off because she did not have any sick days available.

139.   Autumn was never given the option to use unpaid leave under the Maine Family Medical Leave Requirements Act or as an accommodation for her mental health disability, despite Ms. Fales identifying that Autumn had experienced a "mental health" injury at work.

140.   In January 2019, Autumn was disciplined for being late to work. After receiving notice of the investigation, Autumn met with Ms. Fales again and told her that the anxiety from being reassigned and being subject to

33

harassment, unfair stereotyping, and scrutiny had "physically made me sick," and that the lack of overtime opportunities and uncertainty over her schedule had caused her to drop out of college, which had further exacerbated her anxiety.

141.   Autumn explained that she was frustrated by being denied time off to seek treatment and being denied "stress leave." She expressed concern that she was being investigated for being late and for her use of time off when she was not being allowed to take the time she needed to get medical treatment.

142.   Ms. Fales told Autumn that disciplining employees for being tardy or taking leave was "automatic," explaining that there is an employee who goes into the computer system and pulls a report of late employees, and if Autumn's name comes up on the report, they are obligated to report it and start the discipline process.

143.   Ms. Fales said, "as far as your tardiness, that you've got to own because that's you." When Autumn explained that her anxiety was making it difficult for her to get to work on time, Ms. Fales did not give Autumn the option to request an accommodation for her anxiety or offer any modifications to the "automatic" policy requiring discipline for any type of tardiness.

144.   Ms. Fales instead told Autumn that she should want to be at work on time because she should want to prove that she is "a good officer."

34

145.   Autumn also specifically reported to Ms. Fales that she had been denied leave to go to doctor's appointments and described how she had made appointments for a particular day off only to have the leave revoked with little notice, forcing her to cancel important medical appointments.

146.   Autumn emphasized to Ms. Fales that she had put in leave requests for doctor's appointments almost six months in advance but that they were still denied due to a supposed lack of staffing.

147.   On March 14, 2019, Autumn informed Ms. Fales that she was still suffering from severe anxiety due to the harassment and discipline at work. She told Ms. Fales that she was having trouble sleeping, which had contributed to her being late to work.

148.   In response, Ms. Fales had Autumn fill out another workers' compensation form, and for the first time gave Autumn FMLA paperwork to request leave for her doctor's appointments. At that time, Autumn requested to take leave for counseling and healthcare treatment, and she provided documentation from her doctor that she was "anxious, depressed, not sleeping or eating well and is having difficulty at times concentrating, focusing, and very fatigued."

149.   After her leave request was approved, she was finally able to take leave for a doctor's appointment, and she was diagnosed with and began treatment for anxiety and adjustment disorder with depressed mood.

35

150.   Most instances of Autumn's tardiness and sick leave were due to the adverse effects of the sex-based harassment and discrimination by her peers and managers on her mental and physical health.

## The Sex-based Harassment Persists after Autumn Transfers to a New Facility

151.   In September 2019, in the hope that a change of environment would stop the harassment, Autumn transferred to Bolduc Correctional Facility (BCF). Unfortunately, she has experienced harassment there, too.

152.   Autumn's supervisor at BCF, Sergeant Dale Tobey, made frequent homophobic comments to Autumn and other correctional officers, including:

a.   Regularly using the word "fag" in front of prisoners and other officers. As one recent example, in about October 2020, Autumn brought blueberry flavored coffee into work and offered some of it to the other officers. Sergeant Tobey asked another male officer whether he "drank some of that 'fag coffee.'"

b.   In February 2021, Sergeant Tobey referred to a prisoner as "crying like a wounded queer."

c.   When someone would eat food that Sergeant Tobey did not like, he would say "anyone who would eat that would suck a dick."

36

d.    On another occasion, several officers were watching the television show RuPaul's Drag Race on one of the computer screens in Sergeant Tobey's office. When he saw what show it was, he said, "who put this flaming queer on my computer screen?"

153.   Sergeant Tobey has also made inappropriate sex-based comments to Autumn and his other female subordinates.

154.   For example, in February 2021, Sergeant Tobey mentioned that his birthday was coming up. When a female officer asked him how old he was turning and made a comment about being younger than him, his response was, "I guess that means I'll never get to be your boy toy."

155.   Sergeant Tobey frequently stated  that Autumn was a "typical female."

156.   On several different occasions, including in about December 2020, Sergeant Tobey suggested that a male CO "take one for the team" and "try to flip" Autumn's sexual orientation by sleeping with her.

157.   Autumn and her coworkers reported these discriminatory comments by Sergeant Tobey to the Department. The Department allowed Sergeant Tobey to resign after it began an investigation.

## Other Female Correctional Officers Endure Similar Sex-Based Harassment.

158.   Autumn is not the only female employee who has been subjected to sex-based harassment at the Prison or BCF. Other female COs have endured similar sex-based harassment and hostile working conditions.

159.   For example, one female Prison employee was told by a male CO, "I don't believe women should work here," and when she called a Correctional Acuity Specialist to ask about a job opening that she was interested in, she was told that she would not get the position because "women are more trouble than they're worth down here."

160.   In general, male officers would make comments to this female officer, as they did to Autumn, referencing the stereotype that female COs will end up sleeping with inmates.

161.   She also experienced harassment from male officers because of her sex. For example, when she started working at the Prison, like Autumn, she received social media and text messages from other officers with sexual content, messages asking her to be "secret flirt buddies," and messages asking her out on dates.

162.   One male officer in particular made sexual comments to her, such as telling her that a nurse was sexually attracted to him, asking if a girl she

dated in high school had given her oral sex, touching her leg repeatedly in a sexually suggestive manner, and commenting about her appearance.

163.   When she reported this sexual harassment to her supervisor, he told her they could not do anything because it was her word against his. She later reported the sexual harassment to Human Resources, and they had no record of her earlier report to her supervisor.

164.   Like Autumn, she noticed that female COs at the Prison are treated much worse than male COs. She observed that female COs were singled out for extra scrutiny, distrust, disrespect, and discipline, due to the stereotype that they will have inappropriate contact with prisoners.

165.   In her current role as a CCTW, the extraordinary scrutiny and mistrust of female employees makes it difficult for her to do her job, which includes checking in with prisoners about their well-being and providing counseling, emotional support, and guidance. Because of a belief in stereotypes about female employees, male officers will warn inmates she is counseling that they will be disciplined if they talk to her for too long.

166.   Other female COs have also experienced egregious sexual harassment, including one CO who had her butt slapped and grabbed by a male CO with whom she worked, and a CO whose supervisor pressured her into dating a male CO and then retaliated against her when she ended the relationship.

### Administrative Procedure

167.   On April 11, 2019, Autumn filed a complaint against Defendants with the MHRC and EEOC for subjecting her to unlawful discrimination and a hostile work environment on the basis of her sex and sexual orientation, for retaliating against her for her complaints of harassment and discrimination, and for failing to accommodate her disability.

168.   On December 8, 2020, the MHRC investigator issued an investigator's report recommending that the Commission issue a reasonable grounds finding that Defendants discriminated against Autumn and subjected her to a hostile work environment on the basis of sex.

169.   On January 13, 2021, the MHRC voted to issue a reasonable grounds finding in favor of Ms. Dinsmore on her claims for disparate treatment and a hostile work environment on the basis of her sex.

170.   On April 12, 2021, the MHRC issued a notice of failed conciliation and notice of right to sue.

171.   On June 28, 2021, the EEOC adopted the MHRC's reasonable grounds finding after reviewing the MHRC's investigation.

172.   On July 9, 2021, the EEOC issued a notice of right to sue.

173.   Under 5 M.R.S. § 4622, Ms. Dinsmore has satisfied one or more of the prerequisites to be awarded attorney fees and all available damages

40

under the Maine Human Rights Act and the Maine Whistleblowers'
Protection Act.

174.   Ms. Dinsmore has exhausted all administrative remedies for all
claims in this action that require administrative exhaustion.

## Legal Claims

175.   The allegations in paragraphs 1-173 are realleged.

176.   Defendant State of Maine Department of Corrections has
intentionally discriminated against Autumn because of her sex and sexual
orientation, including by allowing a sex-based, severe and pervasive hostile
work environment to persist at the Prison and at BCF in violation of Title VII
of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the
Maine Human Rights Act, 5 M.R.S. § 4551 *et seq.* ("MHRA").

177.   Acting under color of state law, Defendants Parsons and Tobey
denied Autumn her constitutional right of Equal Protection to be free of sex
discrimination, in violation of 42 U.S.C. § 1983.

178.   Defendants intentionally retaliated against Autumn for reporting
conduct she reasonably believed was unlawful, for opposing discrimination,
and for participating in investigations of discrimination, and interfered with
her right to work free from sex discrimination, in violation of Title VII, the
MHRA, and the Maine Whistleblowers' Protection Act, 26 M.R.S. §§ 831-840.

179.   Acting under color of state law, Defendants Parsons and Tobey retaliated against Autumn for exercising her First Amendment rights, in violation of 42 U.S.C. § 1983.

180.   Defendant State of Maine Department of Corrections intentionally interfered with Autumn's right to take medical leave for her own serious medical condition and retaliated against her for taking medical leave in violation of the Maine Family Medical Leave Requirements law, 26 M.R.S. § 844.

181.   Defendant State of Maine Department of Corrections denied Autumn reasonable accommodations for her disabilities of anxiety, adjustment disorder, and depression in violation of the MHRA and Section 504 of the Rehabilitation Act.

182.   Because the foregoing claims arise out of the same transaction or occurrence—a hostile and abusive work environment—it would not promote clarity to state them in separate counts.

183.   Autumn is pursuing all possible methods of proving discrimination, interference, and retaliation, including but not limited to, circumstantial and direct evidence, pretext evidence, as well as causation based on a single unlawful motive and mixed motives, including an unlawful motive.

184.   As a direct and proximate result of Defendants' intentional discrimination, interference, and retaliation, Autumn has suffered and will continue to suffer damages, including, but not limited to, back pay and benefits, loss of self-confidence and self-respect, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of her job and of her life, injury to reputation, and other pecuniary and non-pecuniary losses. Wherefore, Plaintiff requests relief against Defendants as follows:

(a)   Enter declaratory relief that Defendants violated Autumn's statutory and constitutional civil rights to be free of sex, sexual orientation, and disability discrimination, interference, and unlawful retaliation;

(b)   Enter injunctive relief ordering Defendant to:

- provide effective civil rights training for all human resources employees and all supervisors on the requirements of all applicable laws prohibiting employment discrimination because of sex and complete this training within 60 days of the entry of Judgment for Injunctive Relief;

- provide this training for two years after the date judgment is entered to all new human resources and supervisory employees within 60 days of their starting the position;

- maintain attendance sheets identifying each person who

43

attended each training session and forward a copy of the attendance sheets to Plaintiff's counsel within seven days of each training session;

- post at the worksite a copy of a remedial notice detailing the judgment in this case as well as the order providing injunctive relief; and

- send a letter printed on Defendant's letterhead to all of Defendant's employees advising them of the judgment in this case, enclosing a copy of their policies regarding anti-discrimination and retaliation, and stating that they will not tolerate any such discrimination or retaliation, and will take appropriate disciplinary action against any employee or agent of Defendants who engages in such discrimination.

(c)     Award back pay for lost wages and benefits;

(d)     Award as liquidated damages an amount equal to twice the amount of unpaid wages and benefits;

(e)     Award compensatory damages in amounts to be determined at trial by the jury or nominal damages;

(f)     Award punitive damages against Defendants Parsons and Tobey in amounts to be determined at trial by the jury;

(g)     Award Plaintiff full costs and reasonable attorney's fees;

44

(h)   Award pre-judgment interest; and

(i)   Award such further relief as is deemed appropriate.

Date: July 12, 2021                          Respectfully submitted,


/s/ Shelby H. Leighton
Shelby H. Leighton, Esq.
Johnson, Webbert & Garvan, LLP
160 Capitol Street, P.O. Box 79
Augusta, ME 04332-0079
(207) 623-5110
sleighton@work.law


/s/ Valerie Z. Wicks
Valerie Z. Wicks, Esq.
Johnson, Webbert & Garvan, LLP
160 Capitol Street, P.O. Box 79
Augusta, ME 04332-0079
(207) 623-5110
vwicks@work.law


/s/ David G. Webbert
David G. Webbert
Johnson, Webbert & Garvan, LLP
160 Capitol Street
Augusta, ME 04330
Tel: (207) 623-5110
dwebbert@work.law

*Attorneys for Plaintiff*

45